UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| ASCENTIUM CAPITAL LLC, | * | CIVIL ACTION NO. 5:21-cv-00255 |
| Plaintiff, | * | JUDGE ELIZABETH E. FOOTE |
| v. | * | MAGISTRATE MARK L. HORNSBY |
| | * | |
| DIGITAL SIGN SOLUTIONS LLC and | * | |
| ARVIN WADDLES, | * | |
| | * | |
| Defendants. | * | |

---

**AMENDED COMPLAINT**

---

COMES NOW Plaintiff Ascentium Capital LLC ("<u>Ascentium</u>"), and states its amended complaint against the above-named Defendants as follows:

**PRELIMINARY STATEMENT**

Ascentium is the victim of eight fraudulent equipment financing transactions orchestrated by Digital Sign Solutions LLC ("<u>DSS</u>") and Arvin Waddles ("<u>Waddles</u>").  To perpetrate their fraudulent scheme, DSS and Waddles masqueraded DSS as a vendor engaged in the sale of high-end LED signage and related equipment to businesses seeking financing from Ascentium.  This was accomplished by submitting numerous sham DSS invoices to mislead Ascentium into believing that DSS was selling valuable equipment to these borrowers.  In addition, at least three of these transactions involved financing applications submitted on behalf of borrowers that were subsequently determined to be victims of identity theft.

In reliance on sham invoices from DSS, Ascentium deposited loan proceeds totaling over $600,000.00 into a DSS account designated by Waddles.  Ascentium subsequently discovered that DSS and Waddles in fact never sold or delivered a single LED sign or other item of equipment to Ascentium's customers, as the invoices were merely part of an elaborate ruse to enable DSS and Waddles to wrongfully obtain money from Ascentium.

To date, DSS and Waddles have refused to return the ill-gotten loan proceeds to Ascentium or otherwise account for their unlawful activities.  Accordingly, Ascentium brings this action to hold DSS and Waddles accountable for their actions and the financial losses it has incurred as a result. As further support, Ascentium alleges the following:

### PARTIES, JURISDICTION, AND VENUE

1.       Ascentium is a Delaware limited liability company with a primary place of business in Texas.

2.       Ascentium's sole member is RF Ascentium, LLC, a Delaware limited liability company with its principal place of business in Wilmington, Delaware.  RF Ascentium, LLC's sole member is Regions Bank.  Regions Bank is an Alabama corporation with its principal place of business in Birmingham, Alabama.  Accordingly, Ascentium is a  citizen of the state of Alabama.

3.       Defendant Digital Sign Solutions LLC (*i.e.*, DSS) is a Louisiana limited liability company owned and operated by Defendant Arvin Waddles (*i.e.*, Waddles).  Upon information and belief, DSS is a single member LLC and Defendant Arvin Waddles is the sole member of DSS.  Ascentium is not aware of any other members of DSS.

4.       Defendant Waddles is domiciled in the State of Louisiana.  Ascentium previously attempted to serve Ascentium's original complaint [Doc. 1] on Defendant Waddles at the last

known Louisiana address, 2998 Mt. Bethel Road, Keithville, Louisiana 71047. At that time, Ascentium discovered that Defendant Waddles is currently residing in Texas at 4600 Victory Drive, Apartment 73, Marshall Texas 75672. Ascentium is unaware whether or not Waddles moved to Texas permanently and with the intent to remain there such that Texas, and not Louisiana, is now his domicile. If Waddles did in fact move to Texas with the intent to remain in Texas, then Defendant Waddles is domiciled in Texas.

5.      Defendant Waddles is a citizen of the State of Louisiana and, therefore, Defendant DSS is also a citizen of the State of Louisiana. Alternatively, if Waddles is determined to be domiciled in Texas, then DSS is a citizen of Texas.

6.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00.

7.      As citizens of the State of Louisiana operating a business in Shreveport, this Court has personal jurisdiction over Defendants.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the wrongful conduct occurred in this district.

**ASCENTIUM'S BUSINESS MODEL**

9.      Ascentium is a commercial lender that provides equipment and technology financing solutions for companies ranging in size to family-owned businesses to Fortune 500s.

10.     Among other industries, Ascentium provides financing and leasing options for manufacturers, distributors, resellers, and franchise organizations, as well as direct financing options for small businesses in the United States.

11.     With the typical equipment finance transaction, Ascentium provides funding for some or all of the purchase price of the equipment on credit terms, and Ascentium takes a purchase money security interest in the equipment to secure repayment.

12.     In these equipment finance transactions, Ascentium's collateral is often a significant if not primary source of recovery if the customer defaults on the loan.  Accordingly, the availability and value of the collateral is often a critical aspect of Ascentium's lending decisions.

**DEFENDANT DSS'S TRANSACTIONS WITH BORROWERS**

*BC Professional LLC (Colorado Springs, Colorado)*

13.     BC Professional LLC ("BC Professional") is a Colorado limited liability company that purportedly operates or operated a business at 625 North Cascade Avenue, Colorado Springs, Colorado 80903 (the "Colorado Springs Premises").

14.     On or about May 15, 2019, BC Professional's member, Ryan Cook, applied for a loan from Ascentium on BC Professional's behalf.  Mr. Cook represented that BC Professional needed the loan to purchase an LED billboard sign from Defendant DSS for the Colorado Springs Premises.

15.     Defendant Waddles submitted a DSS invoice to Ascentium in furtherance of BC Professional's credit application, a true copy of which is attached as **EXHIBIT 1** ("DSS Invoice No. 05149A2").

16.     According to DSS Invoice No. 05149A2, Defendant DSS had sold (or proposed to sell) a high-end LED billboard sign and related equipment to BC Professional (collectively, the "BC Professional Equipment") for the sum of $82,750.00, plus taxes and freight charges.

17.     According to DSS Invoice No. 05149A2, Defendant DSS intended to deliver the BC Professional Equipment to the Colorado Springs Premises.

18.     Ascentium approved the credit application from BC Professional under the terms of Equipment Finance Agreement No. 2373593 (the "BC Professional Loan"), a true copy of which is attached as **EXHIBIT 2**.

19.     Pursuant to the terms of the BC Professional Loan, BC Professional granted Ascentium a first-priority purchase money security interest in the BC Professional Equipment.

20.     Ascentium duly perfected its security interest in the BC Professional Equipment by recording a UCC financing statement in Colorado, a true copy of which is attached as **EXHIBIT 3**.

21.     On May 15, 2019, Ascentium advanced funds to DSS on BC Professional's behalf to pay DSS Invoice No. 05149A2.  Ascentium made the advance by an electronic funds transfer (or "EFT") in the amount of $90,990.75 into the deposit account of Defendant DSS designated by Defendant Waddles.

22.     Defendants DSS and Waddles knew Ascentium sent the EFT for the singular purpose of completing BC Professional's purchase of the BC Professional Equipment and paying Invoice No. 05149A2 on BC Professional's behalf.

23.     Defendants DSS and Waddles knew Ascentium intended for the BC Professional Equipment to serve as collateral and secure BC Professional's repayment of the BC Professional Loan.

24.     On information and belief, Defendant DSS never sold the BC Professional Equipment to BC Professional.

25.     On information and belief, Defendant DSS never delivered the BC Professional Equipment to the Colorado Springs Premises.

26.     On information and belief, BC Professional never owned, leased, or had an interest in the Colorado Springs Premises.

27.     Defendants DSS and Waddles did not notify Ascentium about the aborted transaction with BC Professional or return Ascentium's funds.

28.     BC Professional defaulted on the BC Professional Loan within a few months after Ascentium paid Defendant DSS.

29.     Despite repeated requests, Defendants DSS and Waddles have failed and refused to identify or provide the location of any BC Professional Equipment.

30.     After BC Professional's default, Ascentium determined there is no BC Professional Equipment to repossess and sell to mitigate its losses.

31.     Ascentium has been unable to collect the outstanding balance of the BC Professional Loan from BC Professional or its principal Ryan Cook.

32.     Ascentium's losses from the BC Professional Loan and related funding to Defendant DSS exceed $90,000.00 to date.

### *Do All Concrete & Construction Inc. (Pomona Park, Florida)*

33.     Do All Concrete & Construction, Inc. ("Do All Concrete") is a Florida corporation that purportedly operates or operated a business at 354 Sisco Road, Pomona Park, Florida 32181 (the "Pomona Park Premises").

34.     In June 2019, a person identifying himself as Keach Vinson, President of Do All Concrete, applied for a loan from Ascentium on Do All Concrete's behalf.  This person represented that Do All Concrete needed the loan to purchase an LED billboard sign from Defendant DSS for the Pomona Park Premises.

35.     Defendant Waddles submitted a DSS invoice to Ascentium in furtherance of Do All Concrete's credit application, a true copy of which is attached as **EXHIBIT 4** ("DSS Invoice No. 060719EL").

36.     According to DSS Invoice No. 060719EL, Defendant DSS had sold (or proposed to sell) a high-end LED billboard sign and related equipment to Do All Concrete (collectively, the "Do All Concrete Equipment") for the sum of $37,000.00, plus taxes and freight charges.

37.     According to DSS Invoice No. 060719EL, Defendant DSS intended to deliver the Do All Concrete Equipment the Pomona Park Premises.

38.     Ascentium approved the credit application from Do All Concrete under the terms of Equipment Finance Agreement No. 2373593 (the "Do All Concrete Loan"), a true copy of which is attached as **EXHIBIT 5**.

39.     Pursuant to the terms of the Do All Concrete Loan, Do All Concrete granted Ascentium a first-priority purchase money security interest in the Do All Concrete Equipment.

40.     Ascentium duly perfected its security interest in the Do All Concrete Equipment by recording a UCC financing statement in Florida, a true copy of which is attached as **EXHIBIT 6**.

41.     On June 17, 2019, Ascentium advanced funds to DSS on Do All Concrete's behalf to pay DSS Invoice No. 060719EL.  Ascentium made the advance by an EFT in the amount of $40,000.00 into the deposit account of Defendant DSS designated by Defendant Waddles.

42.     Defendants DSS and Waddles knew Ascentium sent the EFT for the singular purpose of completing Do all Concrete's purchase of the Do All Concrete Equipment and paying DSS Invoice No. 060719EL on Do All Concrete's behalf.

43.     Defendants DSS and Waddles knew Ascentium intended for the Do All Concrete Equipment to serve as collateral and secure Do All Concrete's repayment of the Do All Concrete Loan.

44.     On information and belief, Defendant DSS never sold the Do All Concrete Equipment to Do All Concrete.

45.     On information and belief, Defendant DSS never delivered the Do All Concrete Equipment to the Pomona Park Premises.

46.     Defendants DSS and Waddles did not notify Ascentium about the aborted transaction with Do All Concrete or return Ascentium's funds.

47.     Do All Concrete immediately defaulted on the Do All Concrete Loan after Ascentium paid Defendant DSS.

48.     After Do All Concrete's default, Ascentium determined there is no Do All Concrete Equipment to repossess and sell to mitigate its losses.

49.     After Do All Concrete's default, Ascentium's investigation revealed Mr. Vinson had been the victim of identity theft, meaning that someone purporting to be Mr. Vinson transacted with Defendant DSS.

50.     Ascentium has been unable to identify the fraudster who held himself out as the President of Do All Concrete and entered into the Do All Concrete Loan.

51.     Despite repeated requests, Defendants DSS and Waddles have failed and refused to identify the fraudster or otherwise cooperate in Ascentium's investigation of the fraud.

52.     Ascentium's losses from the Do All Concrete Loan and related funding to Defendant DSS exceed $40,000.00 to date.

***Enegal LLC (Raleigh, North Carolina)***

53.     Enegal LLC ("Enegal") is a North Carolina limited liability company that purportedly operates or operated a business at 8801 Fast Park Drive, Suite 301, Raleigh, North Carolina 27617 (the "Raleigh Premises").

54.     On or about May 29, 2019, Enegal's Chief Executive Officer ("CEO"), Gene Mcphaul, applied for a loan from Ascentium on Enegal's behalf.  Mr. Mcphaul represented that

Enegal needed the loan to purchase an LED billboard sign from Defendant DSS for the Raleigh Premises.

55.     Defendant Waddles submitted a DSS invoice to Ascentium in furtherance of Enegal's credit application, a true copy of which is attached as **EXHIBIT 7** ("DSS Invoice No. 5292019DAF").

56.     According to DSS Invoice No. 5292019DAF, Defendant DSS had sold (or proposed to sell) a high-end LED billboard sign and related equipment to Enegal (collectively, the "Enegal Equipment") for the sum of $58,000.00, plus taxes and freight charges.

57.     According to DSS Invoice No. 5292019DAF, Defendant DSS intended to deliver the Enegal Equipment to the Raleigh Premises.

58.     Ascentium approved the credit application from Enegal under the terms of Equipment Finance Agreement No. 2376789 (the "Enegal Loan"), a true copy of which is attached as **EXHIBIT 8**.

59.     Pursuant to the terms of the Enegal Loan, Enegal granted Ascentium a first-priority purchase money security interest in the Enegal Equipment.

60.     Ascentium duly perfected its security interest in the Enegal Equipment by recording a UCC financing statement in Colorado, a true copy of which is attached as **EXHIBIT 9.**

61.     On May 30, 2019, Ascentium advanced funds to DSS on Enegal's behalf to pay DSS Invoice No. 5292019DAF.  Ascentium made the advance by an EFT in the amount of $65,105.00 into the deposit account of Defendant DSS designated by Defendant Waddles.

62.     Defendants DSS and Waddles knew Ascentium sent the EFT for the singular purpose of completing Enegal's purchase of the Enegal Equipment and paying DSS Invoice No. 5292019DAF on Enegal's behalf.

63. Defendants DSS and Waddles knew Ascentium intended for the Enegal Equipment to serve as collateral and secure Enegal's repayment of the Enegal Loan.

64. On information and belief, Defendant DSS never sold the Enegal Equipment to Enegal.

65. On information and belief, Defendant DSS never delivered the Enegal Equipment to the Raleigh Premises.

66. Defendants DSS and Waddles did not notify Ascentium about the aborted transaction with Enegal or return Ascentium's funds.

67. Enegal defaulted on the Enegal Loan within a few months after Ascentium paid Defendant DSS.

68. Despite repeated requests, Defendants DSS and Waddles have failed and refused to identify or provide the location of any Enegal Equipment.

69. After Enegal's default, Ascentium determined there is no Enegal Equipment to repossess and sell to mitigate its losses.

70. Ascentium has been unable to collect the outstanding balance of the Enegal from Enegal or its CEO Gene Mcphaul.

71. Ascentium's losses from the BC Professional Loan and related funding to Defendant DSS exceed $65,105.00 to date.

### *Express Medical Transportation LLC (Denver, Colorado)*

72. Express Medical Transportation LLC ("Express Medical") is a Colorado limited liability company that purportedly operates or operated a business at 1338 South Valentia Street, Denver, Colorado 80247 (the "Denver Premises").

73.     On or about May 28, 2019, Express Medical's managing member, Dana Davis, applied for a loan from Ascentium on Express Medical's behalf.  Dana Davis represented that Express Medical needed the loan to purchase an LED billboard sign from Defendant DSS for the Denver Premises.

74.     Defendant Waddles submitted a DSS invoice to Ascentium in furtherance of Express Medical's credit application, a true copy of which is attached as **EXHIBIT 10** ("DSS Invoice No. 052319T1").

75.     According to DSS Invoice No. 052319T1, Defendant DSS had sold (or proposed to sell) a high-end LED billboard sign and related equipment to Express Medical (collectively, the "Express Medical Equipment") for the sum of $58,000.00, plus taxes and freight charges.

76.     According to DSS Invoice No. 052319T1, Defendant DSS intended to deliver the Express Medical Equipment to the Denver Premises.

77.     Ascentium approved the credit application from Express Medical under the terms of Equipment Finance Agreement No. 2375569 (the " Express Medical Loan"), a true copy of which is attached as **EXHIBIT 11**.

78.     Pursuant to the terms of the Express Medical Loan, Express Medical granted Ascentium a first-priority purchase money security interest in the Express Medical Equipment.

79.     Ascentium duly perfected its security interest in the Express Medical Equipment by recording a UCC financing statement in Colorado, a true copy of which is attached as **EXHIBIT 12**.

80.     On May 29, 2019, Ascentium advanced funds to DSS on Express Medical's behalf to pay DSS Invoice No. 052319T1.  Ascentium made the advance by an EFT in the amount of $40,000.00 into the deposit account of Defendant DSS designated by Defendant Waddles.

81.     Defendants DSS and Waddles knew Ascentium sent the EFT for the singular purpose of completing Express Medical's purchase of the Express Medical Equipment and paying DSS Invoice No. 052319T1 on Enegal's behalf.

82.     Defendants DSS and Waddles knew Ascentium intended for the Express Medical Equipment to serve as collateral and secure Express Medical's repayment of the Express Medical Loan.

83.     On information and belief, Defendant DSS never sold the Express Medical Equipment to Express Medical.

84.     On information and belief, Defendant DSS never delivered the Express Medical Equipment to the Denver Premises.

85.     Defendants DSS and Waddles did not notify Ascentium about the aborted transaction with Express Medical or return Ascentium's funds.

86.     Express Medical immediately defaulted on the Express Medical Loan after Ascentium paid Defendant DSS.

87.     After Express Medical's default, Ascentium determined there is no Express Medical Equipment to repossess and sell to mitigate its losses.

88.     Despite repeated requests, Defendants DSS and Waddles have failed and refused to identify or provide the location of any Express Medical Equipment.

89.     Ascentium has been unable to collect the outstanding balance of the Express Medical Loan from Express Medical or its managing member Dana Davis.

90.     Ascentium's losses from the Express Medical Loan and related funding to Defendant DSS exceed $40,000.00 to date.

***Holmes Real Estate Investing, LLC (Conyers, Georgia)***

91.     Holmes Real Estate Investing, LLC ("Holmes Real Estate") is a Georgia limited liability company that purportedly operates or operated a business at 1775 Parker Road SE, Building C, Suite 210, Conyers, Georgia 30094 (the "Conyers Premises").

92.     In May 2019, a person identifying himself as William Kido, a member of Holmes Real Estate, applied for a loan from Ascentium on Holmes Real Estate's behalf.  This person represented that Holmes Real Estate needed the loan to purchase an LED billboard sign from Defendant DSS for the Conyers Premises.

93.     Defendant Waddles submitted a DSS invoice to Ascentium in furtherance of Holmes Real Estate's credit application, a true copy of which is attached as **EXHIBIT 13** ("DSS Invoice No. 052319A3").

94.     According to DSS Invoice No. 052319A3, Defendant DSS had sold (or proposed to sell) a high-end LED billboard sign and related equipment to Holmes Real Estate (collectively, the " Holmes Real Estate Equipment") for the sum of $64,000.00, plus taxes and freight charges.

95.     According to DSS Invoice No. 052319A3, Defendant DSS intended to deliver the Holmes Real Estate Equipment to the Conyers Premises.

96.     Ascentium approved the credit application from Holmes Real Estate under the terms of Equipment Finance Agreement No. 2375909 (the "Holmes Real Estate Loan"), a true copy of which is attached as **EXHIBIT 14**.

97.     Pursuant to the terms of the Holmes Real Estate Loan, Holmes Real Estate granted Ascentium a first-priority purchase money security interest in the Holmes Real Estate Equipment.

98.     Ascentium duly perfected its security interest in the Holmes Real Estate Equipment by recording a UCC financing statement in Georgia, a true copy of which is attached as **EXHIBIT 15**.

99.    On May 24, 2019, Ascentium advanced funds to DSS on Holmes Real Estate's behalf to pay DSS Invoice No. 052319A3.  Ascentium made the advance by an EFT in the amount of $69,000.00 into the deposit account of Defendant DSS designated by Defendant Waddles.

100.    Defendants DSS and Waddles knew Ascentium sent the EFT for the singular purpose of completing Holmes Real Estate's purchase of the Holmes Real Estate Equipment and paying DSS Invoice No. 052319A3 on Holmes Real Estate's behalf.

101.    Defendants DSS and Waddles knew Ascentium intended for the Holmes Real Estate Equipment to serve as collateral and secure Holmes Real Estate's repayment of the Holmes Real Estate Loan.

102.    On information and belief, Defendant DSS never sold the Holmes Real Estate Equipment to Holmes Real Estate.

103.    On information and belief, Defendant DSS never delivered the Holmes Real Estate Equipment to the Conyers Premises.

104.    Defendants DSS and Waddles did not notify Ascentium about the aborted transaction with Holmes Real Estate or return Ascentium's funds.

105.    Holmes Real Estate defaulted on the Holmes Real Estate Loan within a few months after Ascentium paid Defendant DSS.

106.    After Holmes Real Estate's default, Ascentium determined there is no Holmes Real Estate Equipment to repossess and sell to mitigate its losses.

107.    After Holmes Real Estate's default, Ascentium's investigation revealed the gentleman identifying himself as a member of Holmes Real Estate did not, in fact, have any ownership interest in Holmes Real Estate.

108.    The sole owner of Holmes Real Estate, Shirley Holmes, claims someone assisted her in applying for a working capital loan, not a loan to finance the purchase of an LED billboard sign or any other property.

109.    Shirley Holmes also claims she does not know and has never transacted business with Defendants DSS and Waddles; however, Ascentium's investigation reveals Defendant DSS made at least two EFTs to a deposit account of Holmes Real Estate immediately after receiving the aforementioned EFT from Ascentium.

110.    Despite repeated requests, Defendants DSS and Waddles have failed and refused to identify or provide the location of any Holmes Real Estate Equipment.

111.    Ascentium's losses from the Holmes Real Estate Loan and related funding to Defendant DSS exceed $40,000.00 to date.

### Nav Management & Marketing, LLC (Melbourne, Florida)

112.    Nav Management & Marketing, LLC ("Nav Management") is a Colorado limited liability company that purportedly operates or operated a business at 3270 Suntree Boulevard, Suite 167, Melbourne, Florida 32940 (the "Melbourne Premises").

113.    On or about June 27, 2019, Nav Management's managing member, Travis Robinson, applied for a loan from Ascentium on Nav Management's behalf.  Mr. Robinson represented that Nav Management needed the loan to purchase an LED billboard sign from Defendant DSS for the Melbourne Premises.

114.    Defendant Waddles submitted a DSS invoice to Ascentium in furtherance of Nav Management's credit application, a true copy of which is attached as **EXHIBIT 16** ("DSS Invoice No. M062619MKJ").

115.    According to DSS Invoice No. M062619MKJ, Defendant DSS had sold (or proposed to sell) a high-end LED billboard sign and related equipment to Nav Marketing (collectively, the "Nav Marketing Equipment") for the sum of $79,000.00, plus taxes and freight charges.

116.    According to DSS Invoice No. M062619MKJ, Defendant DSS intended to deliver the Nav Marketing Equipment to the Melbourne Premises.

117.    Ascentium approved the credit application from Nav Marketing under the terms of Equipment Finance Agreement No. 2382514 (the "Nav Marketing Loan"), a true copy of which is attached as **EXHIBIT 17**.

118.    Pursuant to the terms of the Nav Marketing Loan, BC Professional granted Ascentium a first-priority purchase money security interest in the BC Professional Equipment.

119.    Ascentium duly perfected its security interest in the Nav Marketing Equipment by recording a UCC financing statement in Florida, a true copy of which is attached as **EXHIBIT 18**.

120.    On June 28, 2019, Ascentium advanced funds to DSS on Nav Marketing's behalf to pay DSS Invoice No. M062619MKJ.  Ascentium made the advance by EFT in the amount of $86,430.00 into the deposit account of Defendant DSS designated by Defendant Waddles.

121.    Defendants DSS and Waddles knew Ascentium sent the EFT for the singular purpose of completing Nav Marketing's purchase of the Nav Marketing Equipment and paying DSS Invoice No. M062619MKJ on Nav Marketing's behalf.

122.    Defendants DSS and Waddles knew Ascentium intended for the Nav Marketing Equipment to serve as collateral and secure Nav Marketing's repayment of the Nav Marketing Loan.

123.     On information and belief, Defendant DSS never sold the Nav Marketing Equipment to Nav Marketing.

124.     On information and belief, Defendant DSS never delivered the Nav Marketing Equipment to the Melbourne Premises.

125.     Defendants DSS and Waddles did not notify Ascentium about the aborted transaction with Nav Marketing or return Ascentium's funds.

126.     Nav Marketing defaulted on the Nav Marketing Loan within a few months after Ascentium paid Defendant DSS.

127.     Despite repeated requests, Defendants DSS and Waddles have failed and refused to identify or provide the location of any Nav Marketing Equipment.

128.     After BC Professional's default, Ascentium determined there is no Nav Marketing Equipment to repossess and sell to mitigate its losses.

129.     Ascentium has been unable to collect the outstanding balance of the Nav Marketing Loan from Nav Marketing or its managing member Travis Robinson.

130.     Ascentium's losses from the Nav Marketing Loan and related funding to Defendant DSS exceed $120,000.00 to date.

### *UBU Holdings, Inc. (Pomona Park, Florida)*

131.     UBU Holdings, Inc. ("UBU") is a California corporation that purportedly operates or operated a business at 9601 Wilshire Boulevard, Beverly Hills, California 90210 (the "Beverly Hills Premises").

132.     On or about June 26, 2019, a person identifying himself as Walter Morgan, President of UBU, applied for a loan from Ascentium on UBU's behalf.  This person represented

that UBU needed the loan to purchase an LED billboard sign from Defendant DSS for the Beverly Hills Premises.

133.    Defendant Waddles submitted a DSS invoice to Ascentium in furtherance of UBU's credit application, a true copy of which is attached as **EXHIBIT 19** ("DSS Invoice No. 062519TRC").

134.    According to DSS Invoice No. 062519TRC, Defendant DSS had sold (or proposed to sell) a high-end LED billboard sign and related equipment to UBU (collectively, the "UBU Equipment") for the sum of $35,000.00, plus taxes and freight charges.

135.    According to DSS Invoice No. 062519TRC, Defendant DSS intended to deliver the UBU Equipment the Beverly Hills Premises.

136.    Ascentium approved the credit application from UBU under the terms of Equipment Finance Agreement No. 2382709 (the "UBU Loan"), a true copy of which is attached as **EXHIBIT 20**.

137.    Pursuant to the terms of the UBU Loan, UBU granted Ascentium a first-priority purchase money security interest in the UBU Equipment.

138.    Ascentium duly perfected its security interest in the UBU Equipment by recording a UCC financing statement in California, a true copy of which is attached as **EXHIBIT 21**.

139.    On June 27, 2019, Ascentium advanced funds to DSS on UBU's behalf to pay DSS Invoice No. 062519TRC.  Ascentium made the advance by an EFT in the amount of $40,000.00 into the deposit account of Defendant DSS designated by Defendant Waddles.

140.    Defendants DSS and Waddles knew Ascentium sent the EFT for the singular purpose of completing UBU's purchase of the UBU' Equipment and paying DSS Invoice No. 062519TRC on UBU's behalf.

141.    Defendants DSS and Waddles knew Ascentium intended for the UBU Equipment to serve as collateral and secure UBU's repayment of the UBU Loan.

142.    On information and belief, Defendant DSS never sold the UBU Equipment to UBU.

143.    On information and belief, Defendant DSS never delivered the UBU Equipment to the Beverly Hills Premises.

144.    Defendants DSS and Waddles did not notify Ascentium about the aborted transaction with UBU or return Ascentium's funds.

145.    UBU immediately defaulted on the UBU Loan after Ascentium paid Defendant DSS.

146.    After UBU's default, Ascentium determined there is no UBU Equipment to repossess and sell to mitigate its losses.

147.    After UBU's default, Ascentium's investigation revealed Mr. Morgan had been the victim of identity theft, meaning that someone purporting to be Mr. Morgan transacted with Defendant DSS.

148.    Ascentium has been unable to identify the fraudster who held himself out as the President of UBU and entered into the UBU Loan.

149.    Despite repeated requests, Defendants DSS and Waddles have failed and refused to identify the fraudster or otherwise cooperate in Ascentium's investigation of the fraud.

150.    Ascentium's losses from the UBU Loan and related funding to Defendant DSS exceed $40,000.00 to date.

### WB Piano and Furniture LLC (Missouri City, Texas)

151.    On information and belief, WB Piano and Furniture LLC ("WB Piano," and when used collectively with BC Professional, Do All Concrete, Enegal, Express Medical, Holmes Real

Estate, NAV Management, and UBU, the "Borrowers") and collectively with is a fictitious company that purportedly operates or operated a business at 3766 Cartright Road, Missouri City, Texas 77459 (the "Missouri City Premises").

152.    On or about May 6, 2019, a person identifying herself as Ashley Williams, an owner of WB Piano, applied for a loan from Ascentium on WB Piano's behalf.  This person represented that WB Piano needed the loan to purchase an LED billboard sign from Defendant DSS for the Missouri City Premises.

153.    Defendant Waddles submitted a DSS invoice to Ascentium in furtherance of WB Piano's credit application, a true copy of which is attached as **EXHIBIT 22** ("DSS Invoice No. 050619").

154.    According to DSS Invoice No. 050619, Defendant DSS had sold (or proposed to sell) a high-end LED billboard sign and related equipment to WB Piano (collectively, the "WB Piano Equipment") for the sum of $82,750.00, plus taxes and freight charges.

155.    According to DSS Invoice No. 050619, Defendant DSS intended to deliver the WB Piano Equipment the Missouri City Premises.

156.    Ascentium approved the credit application from WB Piano under the terms of Equipment Finance Agreement No. 2371482 (the "WB Piano Loan"), a true copy of which is attached as **EXHIBIT 23**.

157.    Pursuant to the terms of the WB Piano Loan, WB Piano granted Ascentium a first-priority purchase money security interest in the WB Piano Equipment.

158.    Ascentium duly perfected its security interest in the WB Piano Equipment by recording a UCC financing statement in Texas, a true copy of which is attached as **EXHIBIT 24**.

159.    On May 7, 2019, Ascentium advanced funds to DSS on WB Piano's behalf to pay DSS Invoice No. 050619.  Ascentium made the advance by an EFT in the amount of $93,783.75 into the deposit account of Defendant DSS designated by Defendant Waddles.

160.    Defendants DSS and Waddles knew Ascentium sent the EFT for the singular purpose of completing WB Piano's purchase of the WB Piano Equipment and paying DSS Invoice No. 050619 on WB Piano's behalf.

161.    Defendants DSS and Waddles knew Ascentium intended for the WB Piano Equipment to serve as collateral and secure WB Piano's repayment of the WB Piano Loan.

162.    On information and belief, Defendant DSS never sold the WB Piano Equipment to WB Piano.

163.    On information and belief, Defendant DSS never delivered the WB Piano Equipment to the Missouri City Premises.

164.    Defendants DSS and Waddles did not notify Ascentium about the aborted transaction with WB Piano or return Ascentium's funds.

165.    WB Piano defaulted on the WB Piano Loan within one month after Ascentium paid Defendant DSS.

166.    After WB Piano's default, Ascentium determined there is no WB Piano Equipment to repossess and sell to mitigate its losses.

167.    After WB Piano's default, Ascentium's investigation revealed Ms. Williams is not employed or affiliated with WB Piano, Ms. Williams had been the victim of identity theft, and someone purporting to be Ms. Williams transacted with Defendant DSS.

168.    In Ms. Williams' case, Ascentium has identified and obtained a default judgment against the fraudster who held himself out as Ashley Williams and entered into the WB Piano Loan.

169.    Despite repeated requests, Defendants DSS and Waddles nevertheless failed and refused to identify the fraudster or otherwise cooperate in Ascentium's investigation of the fraud.

170.    Ascentium's losses from the WB Piano Loan and related funding to Defendant DSS exceed $94,000.00 to date.

### *Additional Defined Terms*

171.    BC Professional, Do All Concrete, Enegal, Express Medical, Holmes Real Estate, NAV Marketing, UBU, and WB Piano shall each be a "Borrower" and collectively "Borrowers" herein below.

172.    The BC Professional Equipment, the Do All Concrete Equipment, the Enegal Equipment, the Express Medical Equipment, the Holmes Real Estate Equipment, the NAV Marketing Equipment, the UBU Equipment, and the WB Piano Equipment shall be collectively referred to as the "Equipment" herein below.

173.    DSS Invoice No. 05149A2, DSS Invoice No. 060719EL, DSS Invoice No. 5292019DAF, DSS Invoice No. 052319T1, DSS Invoice No. 052319A3, DSS Invoice No. M062619MKJ, DSS Invoice No. 062519TRC, and DSS Invoice No. 050619 shall each be an "Invoice" and collectively the "Invoices" herein below.

174.    The BC Professional Loan, the Do All Concrete Loan, the Enegal Loan, the Express Medical Loan, the Holmes Real Estate Loan, the NAV Marketing Loan, the UBU Loan shall each be a "Loan Transaction" and collectively the "Loan Transactions" herein below.

175.    The EFTs that Ascentium sent DSS in furtherance of the Loan Transactions, as described hereinabove, shall collectively be the "Loan Payments" herein below.

## COUNT I

### FRAUD

176.    Ascentium hereby incorporates the preceding paragraphs of this amended complaint as if restated herein in full.

177.    Upon information and belief, Defendants DSS and Waddles, acting independently and as part of a conspiracy with Borrowers, engaged in a fraudulent scheme whereby they knowingly and intentionally made false representations to and withheld material facts from Ascentium in order to induce Ascentium to enter into the Loan Transactions.

178.    Upon information and belief, Defendants DSS and Waddles, acting independently and as part of a conspiracy with Borrowers, engaged in a fraudulent scheme whereby they knowingly and intentionally made false representations to and withheld material facts from Ascentium in order to induce Ascentium to disburse the Loan Payments into a DSS account designated by Waddles.

179.    Defendants DSS and Waddles perpetrated their fraudulent scheme to obtain the Loan Payments from Ascentium by presenting Ascentium with sham Invoices for bogus sales of non-existent Equipment to Borrowers.

180.    Among the materially false representations from Defendants DSS and Waddles, they prepared and presented Ascentium with Invoices, each of which constituted a representation:

    a.    That DSS had entered into a bona fide sale of the Equipment listed in the Invoice with the Borrower identified in the Invoice, even though no such bona fide sale had occurred;

b. That any Loan Payments provided by Ascentium to DSS would be applied toward such purchase, even though DSS intended to use the Loan Payments for other purposes; and

c. That DSS would deliver the Equipment listed in the Invoice to the business address of the Borrower identified in the Invoice upon receipt of payment from Ascentium, even though DSS never intended to sell or deliver the Equipment at issue.

181. Among the material omissions of fact by Defendants DSS and Waddles, they deliberately withheld from Ascentium and failed to disclose:

a. That the Borrowers did not purchase or intend to purchase the Equipment listed in the Invoices;

b. That Defendants DSS and Waddles intended to use the Loan Payments for purposes unrelated to the sale and delivery of the Equipment; and

c. That Defendants DSS and Waddles intended to disburse some of the Loan Payments to the Borrowers and/or representatives of the Borrowers unknown to Ascentium.

182. Additionally, at least three (3) of the eight (8) Loan Transactions involve identity theft. Upon information and belief, Defendants DSS and Waddles knowingly and intentionally (i) misappropriated the identity of Keach Vinson on behalf of Do All Concrete and Walter Morgan on behalf of UBU and (ii) applied for and obtained loans from Ascentium purportedly to finance the Equipment related thereto, without the knowledge or consent of Keach Vinson or Walter Morgan. . In the alternative, Defendants DSS and Waddles acted in concert and conspired with other persons to accomplish the same fraudulent objective—namely, to misappropriate the identity of Keach Vinson on behalf of Do All Concrete, Walter Morgan on behalf of UBU, and Ashley Williams on behalf of WB Piano, and (ii) apply for and obtain loans from Ascentium to purportedly

24

finance the Equipment related thereto, without the knowledge or consent of Keach Vinson, Walter Morgan, or Ashley Williams, respectively.

183.    Defendants DSS and Waddles engaged in the fraudulent acts described herein with full knowledge that Ascentium made the Loan Payments to DSS for the singular purpose of financing/obtaining a purchase money security interest in the Equipment identified in the corresponding Invoices.

184.    Defendants DSS and Waddles engaged in the fraudulent acts described herein with full knowledge that Ascentium intended for and expected that the Equipment listed in the Invoices that Ascentium paid for the Borrowers would be available as collateral to secure Borrowers' repayment of their respective Loans.

185.    In the event DSS ever intended to sell the Equipment to the Borrowers, Defendants DSS and Waddles never notified Ascentium that the sales had been aborted or returned the Loan Payments to Ascentium.

186.    Ascentium reasonably and justifiably relied on materially false representations of Defendants DSS and Waddles, as described hereinabove.

187.    Ascentium would not have approved the Loans or made the Loan Payments if it had been aware that the aforementioned representations of Defendants DSS and Waddles were materially false.

188.    Ascentium would not have approved the Loans or made the Loan Payments if Defendants DSS and Waddles had disclosed the material facts described in paragraph 181 hereinabove.

189.    As a direct and proximate cause of the fraudulent conduct described herein above, Ascentium has suffered damages in an amount to be determined at trial.

190.    Ascentium hereby claims and is entitled to recover damages from DSS and Waddles (in *solido*) for fraud, in an amount to be proven at trial.

## COUNT II

### CONVERSION

191.    Ascentium hereby incorporates the preceding paragraphs of this amended complaint as if restated herein in full.

192.    Ascentium deposited the Loan Payments into a DSS account designated by Waddles for the singular purpose of completing Borrowers' purchase of Equipment from DSS and paying the corresponding Invoices on Borrowers' behalf.

193.    Defendants DSS and Waddles are not entitled to retain the Loan Payments, in light of the fact that DSS never delivered the Equipment for which it was paid.

194.    Under the facts and circumstances alleged herein, Ascentium is entitled to the immediate return and possession of the Loan Payments.

195.    At all times pertinent hereto, Defendants DSS and Waddles have improperly and wrongfully exercised dominion and control over the Loan Payments.

196.    At all times pertinent hereto, Defendants DSS and Waddles have improperly and wrongfully misappropriated the Loan Payments for their own benefit in contravention of Ascentium's rights and interest therein.

197.    Upon information and belief, Defendants DSS and Waddles, acting independently and as part of a conspiracy, accepted the Loan Payments with the intent of permanently depriving Ascentium of the same.

198.    Defendants DSS and Waddles are jointly and severally liable to Ascentium for conversion.

199.    As a direct and proximate cause of the conversion described herein above, Ascentium has suffered damages in an amount to be determined at trial.

200.    Ascentium hereby claims and is entitled to recover damages for conversion from Defendants DSS and Waddles (in *solido*), in an amount to be proven at trial.

## COUNT III

## LOUISIANA UNFAIR TRADE PRACTICE ACT

201.    Ascentium hereby incorporates the preceding of this amended complaint as if restated herein in full.

202.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("LUPTA"), La. Stat. Ann. § 51:1401 *et seq*., provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful.  La. Stat. Ann. § 51:1405.

203.    Under the facts and circumstances alleged herein, Defendants DSS and Waddles, acting independently and as part of a conspiracy, engaged in unfair or deceptive acts or practices in violation of LUPTA while conducting the business of DSS.

204.    The unfair and deceptive practices committed by Defendants DSS and Waddles involved a fraudulent scheme, whereby they repeatedly prepared and presented Ascentium with sham Invoices for the purpose of deceiving Ascentium and obtaining the Loan Payments under false pretenses.

205.    By providing the eight Invoices described hereinabove to Ascentium, Defendants DSS and Waddles affirmatively represented that (i) DSS was a legitimate business engaged in the sale of high-end LED signage and related equipment, (ii) DSS had either sold or intended to sell the Equipment described on such Invoices to the Borrowers for the price, plus taxes and freight,

set forth on the Invoices, and (iii) DSS would deliver the Equipment to the Borrowers upon payment of the amounts due.

206.    Upon information and belief, Defendants DSS and Waddles concealed the true nature of their "transactions" with the Borrowers to induce Ascentium to enter into the Loan Transactions and send the Loan Payments to DSS.

207.    As a direct and proximate cause of the fraudulent and deceptive practices described herein above, Ascentium has suffered damages in an amount to be determined at trial.

208.    Ascentium hereby claims and is entitled to recover from Defendants DSS and Waddles (in *solido*) treble damages plus attorney fees for the unfair and deceptive acts and practices committed by DSS and Waddles.  La. Stat. Ann. § 51:1409(A).

<u>**COUNT IV**</u>

**OBLIGATION TO RESTORE**

209.    Ascentium hereby incorporates the preceding paragraphs of this amended complaint as if restated herein in full.

210.    Louisiana Civil Code article 2299 provides "a person who has received a payment … not owed to him is bound to restore it to the person from whom he received it."  La. Civ. Code art 2299.  "A thing is not owed when it is paid or delivered for the discharge of an obligation that does not exist." La. Civ. Code art. 2300

211.    Ascentium entered into the various Loan Transactions with Borrowers described herein to finance the purchase of certain specific Equipment from Defendant DSS.  *See* Exhibits 2, 5, 8, 11, 14, 17, 20, and 23.  at "Agreement" ("Ascentium Capital, LLC … agrees to lend to Debtor and you agree to borrow from us an amount *for the financing of Collateral*.") (emphasis supplied).  Thus Ascentium made the Loan Payments pursuant to a perceived obligation to pay the

Invoices from Defendant DSS to complete each such Borrower's purchase of certain Equipment and acquire a purchase money security interest in the Equipment.

212.     If Defendants DSS and Waddles did not sell the Equipment to Borrowers, however, Ascentium was under no obligation to make the Loan Payments.

213.     If Defendants DSS and Waddles in fact did not sell the Equipment to Borrower, however, then the Invoices were not due and owing to DSS.

214.     Defendants DSS and Waddles, acting independently and as part of a conspiracy, have refused to return the Loan Payments to Ascentium.

215.     As a direct and proximate cause of the foregoing acts and conduct of Defendants, Ascentium has suffered damages in an amount to be determined at trial.

216.     Ascentium hereby claims and is entitled to recover damages from Defendants DSS and Waddles (in *solido*) in an amount to be proven at trial for their failure to restore the Loan Payments to Ascentium.

## COUNT V

### DETRIMENTAL RELIANCE

217.     Ascentium hereby incorporates the preceding paragraphs of this amended complaint as if restated herein in full.

218.     Louisiana Civil Code article 1967 provides "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying." La Civ. Code art 1967.

219.     Each Invoice from Defendant DSS constituted a promise to Ascentium that (i) DSS is and was a legitimate business engaged in the sale of high-end LED signage and related equipment, (ii) DSS had either sold or intended to sell the Equipment described on such Invoices

to the Borrowers for the price, plus taxes and freight, set forth on the Invoices, and (iii) DSS would deliver the Equipment to the Borrowers upon payment of the amounts due.

220.     Defendants' conduct of accepting the Loan Payments in a DSS account designated by Waddles likewise constituted a promise to Ascentium that (i) DSS is and was a legitimate business engaged in the sale of high-end LED signage and related equipment, (ii) DSS had either sold or intended to sell the Equipment described on such Invoices to the Borrowers for the price, plus taxes and freight, set forth on the Invoices, and (iii) DSS would deliver the Equipment to the Borrowers upon payment of the amounts due.

221.     Ascentium relied on the promises made by Defendants to its detriment.  Indeed, Ascentium would not have approved the Loans or made the Loan Payments but for these promises.

222.     As a direct and proximate cause of Ascentium's reliance on these promises from Defendants DSS and Waddles, Ascentium has suffered damages in an amount to be determined at trial.

223.     Ascentium hereby claims and is entitled to recover damages from Defendants DSS and Waddles (in *solido*) for detrimental reliance, in an amount to be proven at trial.

## COUNT VI

## UNJUST ENRICHMENT

224.     Ascentium hereby incorporates the preceding paragraphs of this amended complaint as if restated herein in full.

225.     La Civ. Code art. 2298 provides, in pertinent part, that "[a] person who has been enriched without cause at the expense of another person is bound to compensate that person[.]" La Civ. Code art. 2298.

226.    Defendants DSS and Waddles received the Loan Payments in return for the sale and delivery of the Equipment; yet, upon information and belief, DSS and Waddles never sold or delivered the Equipment to the Borrowers.  Consequentially, DSS and Waddles have been enriched without cause.

227.    Under the circumstances presented here, it would be unjust to allow Defendants DSS and Waddles to retain the Loan Payments.

228.    Defendants DSS and Waddles have been unjustly enriched at Ascentium's expense, and applicable law provides Ascentium a remedy.

229.    Ascentium hereby claims and is entitled to recover damages from Defendants DSS and Waddles (in *solido*), in an amount to be proven at trial.

**WHEREFORE,** having stated its amended complaint against Defendants herein above, Ascentium prays for the following relief:

A.     Under Count I, for judgment against Defendants, *in solido*, for compensatory damages in an amount to be proven at trial;

B.     Under Count II, for judgment against Defendants, *in solido*, for compensatory damages in an amount to be proven at trial.

C.     Under Count III, for judgment against Defendants, *in solido*, for a sum equal to three times the amount of actual damages proven at trial, plus reasonable attorney fees and costs;

D.     Under Count IV, for judgment against Defendants, *in solido*, for a sum equal to three times the amount of actual damages proven at trial, plus reasonable attorney fees and costs;

E.     Under Count V, for judgment against the Defendants, *in solido*, for a sum equal to three times the amount of actual damages proven at trial plus reasonable attorney fees and costs.

F.      Under Count VI, for judgment against Defendants, *in solido*, for compensatory damages in an amount to be proven at trial;

G.      Under all Counts, for such other and further legal and equitable relief the Court determines to be just and appropriate.

Submitted by,

*/s/ Lacey E. Rochester*
Lacey E. Rochester (#34733)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
201 St. Charles Ave, Suite 3600
New Orleans, LA 70170
T: (504) 566-5200
E: lrochester@bakerdonelson.com

*/s/ Kevin A. Stine* *
Kevin A. Stine (Ga Bar No. 682588) **(T.A)**
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
3414 Peachtree Rd, NE, Suite 1500
Atlanta, GA 30326
T: (404) 577-6000
E: kstine@bakerdonelson.com

**Counsel for Plaintiff**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this the 19th day of March 2021, I served the forgoing

Amended Complaint on Defendants at the addresses listed below by U.S. Mail.

**Digital Sign Solutions, LLC**
Through its Registered Agent, Arvin Waddles
4600 Victory Drive
Apartment #73
Marshall, Texas 75672

**Arvin Waddles**
Through its Registered Agent, Arvin Waddles
4600 Victory Drive
Apartment #73
Marshall, Texas 75672

/s/ Lacey E. Rochester